**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MARY E. WARREN, | |
| *Plaintiff*, | |
| v. | Civil Action No. 25 - 1880 (SLS) |
| | Judge Sparkle L. Sooknanan |
| ROBERT F. KENNEDY JR., Secretary, U.S. Department of Health and Human Services, | |
| *Defendant*. | |

<u>**MEMORANDUM OPINION**</u>

Mary Warren is a long-time employee of the United States Department of Health and Human Services (HHS). She brought this lawsuit against the Secretary of HHS in his official capacity, alleging race discrimination, retaliation, and a hostile work environment—all in violation of Title VII of the Civil Rights Act of 1964. The Secretary now moves to partially dismiss under Federal Rule of Civil Procedure 12(b)(6). The Court grants that motion in part and denies it in part.

**BACKGROUND**

**A.      Factual Background**

The Court draws the facts, accepted as true, from the Plaintiff's Amended Complaint and attachments. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

Mrs. Warren has worked for the federal government for thirty-five years. Am. Compl. ¶ 22, ECF No. 11. Since December 2019, she has served as the Program Manager for the Drug-Free Federal Workplace Program (DFWP) in the HHS Office of National Security. *Id.* The DFWP works to "eradicat[e] illegal use, possession, or distribution of controlled substances within and without the government." *Id.* ¶ 22 n.6. Mrs. Warren's role as Program Manager—a GS-14

position—is to serve as a "subject matter expert, who develops and implements strategic policies, coordinates substance testing, and serves as a liaison to government officials," thereby "ensuring continuity, consistency, and regulatory compliance across the Agency." *Id.*

During the period relevant to this lawsuit, Mrs. Warren, who is "a Black female," has had various supervisors. *Id.* ¶¶ 4, 7, 25–30. From January 2023 until August 2023, Ann Norris, a white female, was her first-level supervisor. *Id.* ¶¶ 7, 26. During roughly this same period, Alisa Hudgens, also a white female, was Mrs. Warren's second-level supervisor. *Id.* ¶¶ 7, 25. Around mid to late 2023, Mrs. Warren's supervisors shifted. From June 2023 until November 2024, Angela Johnson, a Black female, was her first-level supervisor. *Id.* ¶¶ 7, 27. And in October 2023, Lisa Aguirre, a white female who "reported directly to Ms. Hudgens," became Mrs. Warren's second-level supervisor. *Id.* ¶¶ 27–28. Mrs. Warren alleges that Ms. Hudgens, Ms. Aguirre, and Ms. Norris have all previously "been the subject of" race-discrimination and retaliation "complaints lodged by their Black subordinates." *Id.* ¶ 29. For example, "on or about April 14, 2022, HHS employee U. Scott (Black woman) filed an EEO complaint" against Ms. Hudgens and Ms. Aguirre "alleging racial discrimination and hostile work environment." *Id.* ¶ 29.

Beginning in January 2023, Ms. Hudgens and Ms. Norris began "erecting barriers to [Mrs. Warren's] work performance" that created "tension and hostility" in the workplace. *Id.* ¶ 31. Ms. Norris, who "had no functional knowledge regarding the DFWP, . . . was compelled to take instructions from [Mrs. Warren]." *Id.* Ms. Norris was apparently resentful of this arrangement and, as a result, she and other supervisors allegedly lashed out at Mrs. Warren in various ways. According to Mrs. Warren, they gave her "unreasonable deadlines" that required her to work "excessive" hours without "compensatory time," "excluded [her] from critical meetings," and told her to "stop assuming roles and responsibilities itemized as material for her annual [appraisal]."

*Id*. Mrs. Warren's supervisors also "severely understaffed" Mrs. Warren's office, requiring her to "perform multiple subordinated functions in addition to her higher-level functions and duties," *id*., and to "work on a nearly 24/7 basis," *id.* ¶ 41. This contrasted with other "similar offices" under Ms. Hudgens' line of supervision that were headed by "non-Black or white supervisors" and "were properly staffed." *Id.* ¶ 31. One such office was run by Jeremy Anderson, a white male GS-14 "program manager/supervisor" who was "similarly situated" to Mrs. Warren "in all material respects." *Id*.

In April 2023, while Mrs. Warren was struggling with the challenges imposed by her supervisors, she submitted an HHS-520 form requesting permission to engage in outside work such as "teaching and consulting for a private drug testing service." *Id.* ¶¶ 46, 48. Mrs. Warren's first-line supervisor, Ms. Norris, promptly approved the form, and it went to Ms. Hudgens next. *Id.* But Ms. Hudgens sat on the form for months without advancing it through the approval process. *Id.* ¶¶ 46–48. When Mrs. Warren followed up in September 2023, Ms. Hudgens "claimed she had never received" the form, which conflicted with the information in the electronic approval system. *Id*. ¶¶ 47–48. While the form was ultimately approved in November 2023, Mrs. Warren lost more than six months of potential income because of the delay, though she does not say how much. *Id*. ¶ 48.

During this same period, Mrs. Warren was growing increasingly concerned that her supervisors' "interfer[ence]" with her ability to run her department would cause the DFWP to be "deemed non-compliant" with the statute and executive order that authorized the program. *Id*. ¶ 31. She also "perceived" that she was being subjected to "ongoing racial harassment and bullying" by Ms. Norris and Ms. Hudgens. *Id*.

On June 6, 2023, Mrs. Warren filed an internal complaint under the agency's "Anti-Harassment Policy." *Id*. An agency official assigned to the complaint contacted Mrs. Warren and they had a "brief communication." *Id*. ¶ 33. After that, however, her complaint was "ignored" and was never "investigated or adjudicated." *Id*. Mrs. Warren believes that the agency ignored her complaint because she was "a Black woman." *Id*. Meanwhile, Mrs. Warren says that "the harassment ratcheted upward." *Id*. She suspects that this happened because the agency official she had spoken with informed her supervisors about her complaint. *Id*.

On June 15, 2023, Mrs. Warren met with Ms. Norris and told her about the complaint. *Id*. ¶ 34. Mrs. Warren suspects that Ms. Norris promptly told Ms. Hudgens about the meeting, as the two women "are close and maintain a personal relationship outside of the workplace." *Id*. Soon after, on July 20, 2023, Mrs. Warren received a "threatening, hostile email" from Ms. Norris "shutting down [Mrs. Warren's] effort to implement the process of updating material provisions" of the DFWP. *Id*. "Concerned about retaliation or further threats of critical mission interference," Mrs. Warren immediately emailed the agency official who had first responded to her internal complaint and asked that he assign a "neutral party" to "attend her meetings" with Ms. Norris and Ms. Hudgens. *Id*. He initially agreed but later directed Mrs. Warren to make her request to Ms. Norris and Ms. Hudgens directly, effectively sending her "back to her harassers . . . with her concerns unresolved." *Id*.

Over the ensuing months, additional allegedly harassing and retaliatory incidents followed. On August 18, 2023, while Mrs. Warren was on leave, Ms. Hudgens emailed her and her staff "declaring that the DFWP would be 'transitioning'" to a new office within HHS beginning on October 1, 2023. *Id*. ¶ 42. This transfer had "not been discussed" with Mrs. Warren or her staff and she received "calls from her subordinates while on vacation" expressing that they were

4

"incensed, confused, and bewildered." *Id*. It later turned out that the transfer had not been authorized by senior management and was never implemented. *Id*. Mrs. Warren believes that Ms. Hudgens' "befuddled effort to purportedly realign DFWP" was aimed at getting rid of her, making her look bad, and further undermining her ability to effectively lead the DFWP. *Id*. ¶ 43. None of Mrs. Warren's "similarly situated white, non-Black peers" were "subjected to false announcements of program realignment." *Id.* ¶ 45.

On September 11, 2023, Ms. Hudgens—or others working with her, Ms. Aguirre, or Ms. Norris—denied Mrs. Warren a cash "Spot Award" for "extraordinary work performance" that she had previously been "promised" and that she was "entitled to." *Id.* ¶ 36. They instead gave Mrs. Warren a less desirable "Time Off" award. *Id*. Other "eligible GS 14 supervisors within [Ms.] Hudgens' chain of command [who] did not engage in EEO activity" were given Spot Awards, including a "GS-14 Black male supervisor named D. Thomas." *Id*. ¶ 4. Mrs. Warren alleges that she was denied the Spot Award "because of her race – or in retaliation." *Id.* ¶ 36.

On October 20, 2023, having seen no action on her internal complaint, Mrs. Warren filed an informal EEO Complaint. *Id.* ¶ 53. She then had an initial interview with an EEO counselor on November 3, 2023. *Id.* ¶ 54. She believes that her supervisors were aware of both these actions. *Id*. Only three days after her interview, on November 6, 2023, Mrs. Warren received an email from Ms. Johnson instructing her that "effective immediately," "ALL MESSAGING to ONS [Office of National Security] senior leadership must be routed" to Ms. Johnson. *Id.* ¶ 51 (alteration in original). This requirement "grossly interfered" with Mrs. Warren's "autonomy and her ability to execute her job functions" which, as the agency's subject matter expert, included communicating with senior leadership. *Id.* ¶ 52.

Three days later, on November 9, 2023, Ms. Johnson "ignored" a request by Mrs. Warren to "remove encryption or restriction settings from a non-classified email." *Id.* ¶¶ 55–58. This apparently prevented Mrs. Warren from printing the email or imposed some other unspecified inconvenience. *Id.*

On November 27, 2023, the agency issued Mrs. Warren a notice of her right to file a formal EEO Complaint. *Id.* ¶ 8. She did that on December 8, 2023, and the agency's EEO specialist notified Ms. Hudgens and Ms. Johnson of her complaint one week later. *Id.* ¶ 40.

The following month, on January 29, 2024, Mrs. Warren received her yearly performance appraisal and learned that Ms. Johnson had rated her 4.5 out 5.0 even though her "actual work performance should have been rated 5.0." *Id.* ¶ 37. This "inaccurate, suppressive rating" of Mrs. Warren's performance made her ineligible to receive a performance bonus of up to five percent of her salary or a "Quality Step Increase." *Id.* Mrs. Warren's "similarly situated white, non-Black peers" who "did *not* engage in EEO activity received (and were not deprived of) the maximum performance bonus and/or a [Quality Step Increase]." *Id.* ¶¶ 38–39.

On February 23, 2024, Mrs. Warren filed a second informal EEO Complaint, which the agency treated as an amendment to her first formal complaint. *Id.* ¶ 11. On March 20, 2024, the agency "accepted" nearly all Mrs. Warren's claims for investigation. *Id.* ¶¶ 12–13. Following the investigation, Mrs. Warren submitted a request for a hearing before an EEOC Administrative Judge. *Id.* ¶ 17. Mrs. Warren withdrew that request when she filed this lawsuit. *Id.* ¶ 18.

**B.    Procedural Background**

Mrs. Warren filed this lawsuit on June 13, 2025. ECF No. 1. On January 30, 2026, she filed an Amended Complaint, alleging that the Secretary violated Title VII of the Civil Rights Act of 1964 by discriminating against her based on race (Count III), retaliating against her for

6

complaining about her mistreatment (Count II), and subjecting her to a hostile work environment (Count I). Am. Compl. ¶¶ 65–82. On February 13, 2026, the Secretary moved to partially dismiss Mrs. Warren's lawsuit under Federal Rule of Civil Procedure 12(b)(6). ECF No. 13. That motion is fully briefed and ripe for review. *See* Pl.'s Opp'n, ECF No. 14; Def.'s Reply, ECF No. 15.

## LEGAL STANDARD

Under Rule 12(b)(6), a court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss under Rule 12(b)(6), courts "must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). But courts need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. *See Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## DISCUSSION

Mrs. Warren advances Title VII claims of race discrimination, retaliation, and hostile work environment. The Secretary contends that Mrs. Warren's claims all fail at the pleading stage, except for an aspect of her retaliation claim premised on her 2023 performance appraisal. The Court largely agrees. Mrs. Warren's retaliation claim related to her Spot Award survives at this early stage, but the Court must dismiss her remaining claims as inadequately pleaded.

### A.    Race Discrimination

"Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race[.]'" *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (quoting 42 U.S.C. § 2000e-2(a)(1)). "The two essential elements" for a race-discrimination claim under Title VII "are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race." *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, 134 F.4th 585, 596 (D.C. Cir. 2025) (cleaned up). "A plaintiff must prove both elements to sustain a discrimination claim," *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008), and may rely on either direct or circumstantial evidence to support an inference of discrimination, *Brown v. FERC*, No. 24-cv-2538, 2025 WL 894226, at *5 (D.D.C. Mar. 24, 2025). One way a plaintiff may support an inference of discrimination through circumstantial evidence is by alleging differential treatment of a similarly situated employee. *Yuvienco v. Vilsack*, No. 23-cv-186, 2024 WL 727712, at *3 (D.D.C. Feb. 22, 2024). When relying on comparison to a similarly situated employee, a plaintiff "must plead enough facts about those comparators and the relevant context to allow a plausible inference that he was treated differently because of his race." *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025). "That standard cannot be reduced to a mechanical formula; it is sensitive to the specific context of each case, and courts must draw on their 'judicial experience and common sense' in determining whether it is met." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

It is not entirely clear, but scattered throughout Mrs. Warren's briefing are several alleged adverse employment actions that might support her race discrimination claim: (1) the denial of a previously promised cash Spot Award, (2) her performance evaluation, (3) her unadjudicated internal harassment complaint, (4) the notice that her unit was being transferred to a new office, (5) the delay in approving her request to engage in outside work, (6) the direction to route all emails to senior management through Ms. Johnson, and (7) the failure to act on her request to

remove encryption settings from a non-classified email. Am. Compl. ¶ 12. Even if these alleged actions are all actionable under Title VII, which the Secretary contests, Mot. 19–22; Reply 10–11,[1] Mrs. Warren "has not sufficiently alleged that they were taken *because* of" her race, *Ali v. Zeldin*, No. 25-cv-852, 2026 WL 795815, at *8 (D.D.C. Mar. 23, 2026). Mrs. Warren "alleges no facts that amount to direct evidence of animus." *Id.* "[She] does not, for example, identify any specific comments by [her] supervisors or colleagues referencing [her] race," and instead "relies on broad and conclusory allegations." *Id.*; *see, e.g.*, Am. Compl. ¶¶ 31 (Mrs. Warren "perceived subjection to ongoing racial harassment and bullying by [Ms.] Norris and [Ms.] Hudgens."), 33 (Mrs. Warren "believed that the Agency's ignorance of her [internal complaint] . . . was done because she is a Black woman."), 36 (Mrs. Warren was denied a "Spot Award" "because of her race – or in retaliation."), 37 (Mrs. Warren was given an inaccurate performance appraisal "because of her race or gender or in retaliation."). "These are the exact types of allegations that, standing alone, fail to state a claim." *Ali*, 2026 WL 795815, at *9 (cleaned up).

With no direct evidence of discriminatory animus, Mrs. Warren must rely on comparators. But her allegations on this front are similarly deficient. Mrs. Warren's Amended Complaint makes frequent references to "similarly situated" individuals and peers. *See, e.g.*, Am. Compl. ¶¶ 36, 38, 39, 45, 50, 63, 64, 80. But these conclusory allegations are insufficient. *See Mitchell v. Garland*, No. 23-cv-2412, 2024 WL 3251217, at *4 (D.D.C. July 1, 2024) (pleading a "causal connection"

---

[1] In *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), the Supreme Court held that an employee need only demonstrate "some harm" to sufficiently allege adverse action under Title VII. The Secretary argues that *Muldrow* is inapplicable where federal employees allege discrimination under Title VII. In those cases, the Secretary says, the federal sector provision of Title VII applies, 42 U.S.C. § 2000e-16(a), which requires that the plaintiff identify an enumerated "personnel action" under the Civil Service Reform Act, 5 U.S.C. § 2302(a)(2)(A)(i)–(xi), in order to plead an adverse action. Mot. 19–22. Mrs. Warren does not respond to this argument, thus conceding it. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014). Even so, the Court need not rule on this basis, as Mrs. Warren's discrimination claim fails for other reasons.

between a plaintiff's protected status and "alleged adverse actions . . . requires more than the bald assertion that there is a similarly situated comparator" not of that status who was treated differently); *see also SS & T, LLC v. Am. Univ.*, No. 19-cv-721, 2020 WL 1170288, at *5 (D.D.C. Mar. 11, 2020) ("A plaintiff's assertion that [she] is similarly situated to others is just a legal conclusion—and a legal conclusion is never enough." (cleaned up)).

Beyond those general allegations, Mrs. Warren specifically identifies two individual comparators. The alleged different treatment of the first, a "GS-14 Black male supervisor named D. Thomas," Am. Compl. ¶ 4, cannot support an inference of race discrimination because Mr. Thomas is the same race as Mrs. Warren, *see George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (a plaintiff may support an inference of discrimination by pointing to differential treatment of "similarly situated employees who are *not* part of the protected class" (emphasis added)); *Porter v. Kennedy*, No. 16-cv-2464, 2025 WL 819576, at *7 n.4 (D.D.C. Mar. 13, 2025) (an individual "cannot be a comparator for purposes of a racial discrimination claim" if they are "a member of the same" race as the plaintiff).

The second comparator is a GS-14 "(white male) program manager/supervisor" named Jeremy Anderson, who Mrs. Warren alleges was "similarly situated to [her] in all material respects." Am. Compl. ¶ 31. The Amended Complaint mentions Mr. Anderson only once, as an example of a non-Black supervisor who, like Mrs. Warren, was under Ms. Hudgens' line of supervision but whose office was "properly staffed." *Id.* It is difficult to discern how Mr. Anderson supports Mrs. Warren's race discrimination claim. The only way in which she alleges that they were treated differently is that his office was properly staffed. *Id.* But Mrs. Warren does not identify the lack of staffing in her office as an adverse action to support her race discrimination

10

claim.[2] And she does not otherwise explain why Mr. Anderson is a proper comparator for the adverse actions at issue. Indeed, her briefing mentions Mr. Anderson only once in the facts section, *see* Opp'n 11—notwithstanding the Secretary's robust arguments about the deficiencies regarding her allegations about comparators, Mot. 23–28. In this regard, Mrs. Warren's briefing regarding Mr. Anderson is so spartan that it effectively concedes any reliance on him as a comparator for anything other than staffing complaints. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

Finally, Mrs. Warren's allegations about other employees' discrimination complaints against her supervisors do not salvage her claim. Am. Compl. ¶ 29. Other than the vague allegation that these complaints were "bona fide," *id*., there is nothing to suggest that they were substantiated or that they bear any meaningful resemblance to any of the allegations leveled by Mrs. Warren. Mrs. Warren cites no case supporting that such conclusory allegations about discrimination complaints by other individuals can support a plausible inference that she, too, was discriminated against.[3] And this Court declines to find that Mrs. Warren's spartan allegations reasonably support

---

[2] This might be because Mrs. Warren apparently did not raise any understaffing allegation during the administrative complaint process. *See* Am. Compl. ¶ 12 (detailing the "issues asserted in [Mrs. Warren's] Formal Complaint as well as the Second Informal Complaint"). It is thus not clear that she has administratively exhausted any such claim. *See Park v. Howard Univ.,* 71 F.3d 904, 907 (D.C. Cir. 1995) ("Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge."). The Secretary makes that argument in its motion, Mot. 23–24, and Mrs. Warren does not respond. Mrs. Warren's allegation regarding understaffing, even if not exhausted, might support her hostile work environment claims. *See Wallace v. Wright*, No. 24-cv-2906, 2025 WL 3042025, at *4 (D.D.C. Oct. 31, 2025) ("In some instances, . . . [unexhausted allegations] may be actionable as 'component acts' of a 'hostile work environment claim' that was timely filed." (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, (2002))). But as discussed below, those claims are deficient for other reasons.

[3] The cases that Mrs. Warren cites on this topic address very different procedural circumstances in which trial courts were deemed to have erroneously prevented plaintiffs from presenting evidence *at trial* that other individuals in their workplace had been similarly harassed or discriminated

such an inference here. *Cf. Holcomb v. Powell*, 433 F.3d 889, 899–900 (D.C. Cir. 2006) (holding at summary judgment that the "mere filing" of discrimination complaints by other employees against the plaintiff's supervisor, "where nothing more is known about the nature, merit, or outcome of those complaints," could not establish the supervisor's "discriminatory animus").

Because Mrs. Warren fails to sufficiently allege that any adverse employment actions that she suffered were because of her race, the Court must dismiss her race discrimination claim. *Shanks*, 134 F.4th at 596.

### B.    Retaliation

Turning to retaliation, Title VII makes it unlawful to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "In order to establish a prima facie case of retaliation, a plaintiff must show that he or she: '(1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) there is a causal connection between the two.'" *Shipman v. Nat'l R.R. Passenger Corp. (Amtrak)*, 241 F. Supp. 3d 114, 121 (D.D.C. 2017) (quoting *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003)).

The Secretary does not challenge that Mrs. Warren engaged in protected activity. Mot. 11–19. And he concedes that she has sufficiently alleged at least one act of retaliation (that she was given an inaccurate performance rating). *Id.* 11, 19. Still, the Secretary argues that the remainder of the retaliatory actions alleged by Mrs. Warren are either not "adverse employment

---

against. Opp'n 28 (first citing *Vinson v. Taylor*, 753 F.2d 141 (D.C. Cir. 1985); and then citing *West v. Philadelphia Elec. Co.*, 45 F.3d 744 (3d Cir. 1995)).

actions" or are not sufficiently causally linked to Mrs. Warren's protected activity. *Id.* 11–19. The Court agrees with the Secretary as to all but one aspect of Mrs. Warren's retaliation claim.

### 1. Adverse Actions

"Adverse actions in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim" and are "not limited to discriminatory actions that affect the terms and conditions of employment." *Baloch,* 550 F.3d at 1198 n.4 (cleaned up). Retaliatory actions are "materially adverse" when they "would have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 1198 (cleaned up) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Typically, this means that they involve "significant change[s] in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (cleaned up). They do not encompass "everything that makes an employee unhappy," including "those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* (first quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); then *Burlington,* 548 U.S. at 68).

Mrs. Warren identifies six allegedly retaliatory actions that largely track the adverse actions supporting her discrimination claim: (1) the denial of a previously approved cash Spot Award, (2) the notice that her unit was being transferred to a new office, (3) the delay in approving her request to engage in outside work, (4) the direction to route all emails to senior management through Ms. Johnson, (5) the failure to act on her request to remove encryption settings from a non-classified email, and (6) her performance evaluation. Opp'n 40–42. The Secretary concedes that the denied Spot Award and performance evaluation are materially adverse actions. Reply 4. But he contends that the other four do not measure up. The Court agrees.

First, Ms. Hudgens' email announcing the transition of the DFWP to a new office did not cause any "significant change" to Mrs. Warren's employment. *Bridgeforth*, 721 F.3d at 663. As the Amended Complaint acknowledges, the transition was not approved, and at the time that Mrs. Warren filed this suit, the "unit alignment remain[ed] unchanged." Am. Compl. ¶ 42. As a result, Ms. Hudgens' email did not effect a "substantial change in [Mrs. Warren's] working conditions" that caused her "objective[] harm." *Forkkio v. Powell*, 306 F.3d 1127, 1132 (D.C. Cir. 2002). And any "purely subjective injuries" she suffered—such as "public humiliation," "loss of reputation," or general "dissatisfaction" with Ms. Hudgens' communications—"are not adverse actions." *See id.* at 1130–31.

Second, Ms. Hudgens' delay in granting Mrs. Warren's request to engage in outside activity similarly did not materially change the terms of her employment. To begin, Mrs. Warren's contention that she had time to earn income doing outside work is fundamentally in tension with her allegation that her supervisors' severe understaffing of her office required her to "work on a nearly 24/7 basis" at the DFWP. Am. Compl. ¶ 41. And the sole case cited by Mrs. Warren in support of this claim does not help. *See* Opp'n 41 (citing *Porter v. Bd. of Trs. of N. Carolina State Univ.*, No. 21-cv-365, 2022 WL 2195011, (E.D.N.C. June 17, 2022)). *Porter*, which is not about lost compensation, involved the dismissal of a plaintiff's retaliation claim because the harm he alleged was "speculative." *Porter*, 2022 WL 2195011, at *8. The same is true here of the income that Mrs. Warren might have earned from outside work had she received timely approval. Indeed, Mrs. Warren offers no allegations about income she earned from outside employment *after* she eventually received approval. At bottom, Mrs. Warren fails to allege that the mere delay in approving her request is anything more than the sort of "minor annoyance[] that often take[s] place at work and that all employees experience." *Bridgeforth*, 721 F.3d at 661 (quoting *Burlington*, 548

14

U.S. at 68 (2006)); *see also Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 70 (D.D.C. 2012) ("A materially adverse action is one that results in significant harm or hardship[.]"); *cf. Brookens v. Solis*, 616 F. Supp. 2d 81, 91 (D.D.C. 2009) (denial of "detail" was not adverse action where plaintiff relied on "vague and speculative assertions" that detail would have "provided [the plaintiff] training, experience and promotional or advancement opportunities").

Third, for much the same reasons, Ms. Johnson's apparent refusal to remove encryption and restriction settings from a non-classified email is not a materially adverse employment action. While Mrs. Warren asserts that Ms. Johnson's action imposed a "[r]estriction on [her] ability to perform work," Opp'n 42, she says little about how it actually restricted her work, *see id.* 20 (noting that the receiver of "encrypted emails" would be prevented "from printing them for their documentation/records at their discretion"). Without more, this does not rise above the level of a minor annoyance. *See Ramsey v. Moniz*, 75 F. Supp. 3d 29, 53 (D.D.C. 2014) (finding that "the bulk" of plaintiff's complaints were "petty slights or minor annoyances"—such as "repeated confrontations regarding her use of the telephone," requests for her to "hand deliver documents," her receipt of a "letter of reprimand," and "disagreements over the scope of her work assignments"—that were not actionable adverse actions).

Finally, Mrs. Warren equates Ms. Johnson's directive to send her all messages intended for senior leadership to a "letter of counseling"—*i.e.*, an administrative letter aimed at correcting an employee's performance or behavioral issues—and the Secretary does not reject this characterization. Opp'n 4; Reply 5. But as Mrs. Warren acknowledges, "[a] letter of counseling, . . . if not abusive in tone or language or a predicate for a more tangible form of adverse action, will rarely constitute materially adverse action." *Tillman v. Barr*, No. 17-cv-475, 2019 WL 2550736, at *8 (D.D.C. June 20, 2019); *see also* Opp'n 35. Those criteria are not present here. The

Court is not persuaded that Ms. Johnson's use of capital letters to specify that her directive applied to "ALL MESSAGING" made her message "abusive." Am. Compl. ¶ 51. Nor did the effect of the directive produce a "more tangible form of adverse action." *Tillman*, 2019 WL 2550736, at *8. Mrs. Warren acknowledges that Ms. Johnson was her first-line supervisor at the time she sent the directive. Am. Compl. ¶ 27. While it may have been annoying and burdensome for her supervisor to insist on reviewing messages before they were sent higher up the supervisory chain, the Court is not convinced that Ms. Johnson's directive amounted to a major change in Mrs. Warren's employment or responsibilities. *See Bonnette,* 907 F. Supp. 2d at 70–71 (finding that "oral reprimand," "public embarrassment," "micromanage[ment]," and other "purely subjective injuries or disagreements about management policies and decisions" did not constitute materially adverse actions); *Forkkio*, 306 F.3d at 1132 (plaintiff's allegations that his supervisor had undermined his authority did not "rise[] to the level of an adverse action" because even though the supervision "may have caused him subjective injury, it did not objectively harm his working conditions or future employment prospects").

### 2. Causal Proximity

Only one aspect of Mrs. Warren's retaliation claim reaches this step: the denial of her cash Spot Award. The Secretary argues that Mrs. Warren has not sufficiently alleged a causal connection between this denial and her protected activity. Mot. 15–19. The Court disagrees.

To establish causation, a plaintiff must demonstrate that her protected activity was the but-for cause of the employer's adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). She can do this using direct evidence of retaliatory intent or circumstantial evidence that (1) "the employer had knowledge of the employee's protected activity" and (2) "the adverse action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.

16

Cir. 1985). Temporal proximity can "support an inference of causation . . . where the two events are 'very close' in time." *See Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

Here, the Secretary does not dispute that Mrs. Warren engaged in at least some protected activity in the months preceding the denial of her Spot Award on September 11, 2023. On June 6, 2023, she filed an internal complaint under HHS's Anti-Harassment Policy. Am. Compl. ¶ 31. And on July 20, 2023, she emailed the agency official who had initially responded to her complaint to ask that he assign a neutral party to attend meetings with her supervisors because she was concerned about "retaliation or further threats of critical mission interference." *Id.* ¶ 34; *see Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 150 (D.D.C. 2013) ("[P]rotected activity encompasses utilizing informal grievance procedures, such as complaining to management or human resources about the discriminatory conduct, as well as the filing of both informal and formal EEO complaints."). Mrs. Warren's allegations also support inferring that her supervisors had knowledge of her protected activity. On June 15, 2023, she met directly with Ms. Norris about her complaint. Am. Compl. ¶ 34. And she alleges that Ms. Norris and Ms. Hudgens may have spoken about her complaint because they have a "close . . . personal relationship." *Id.*

While "there is no bright-line rule" for how closely an adverse action must follow protected activity to support an inference of causation, actions within three months generally support such an inference. *See Greer v. Bd. of Trs. of Univ. of D.C.*, 113 F. Supp. 3d 297, 311 (D.D.C. 2015) (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58) (D.C. Cir. 2012). The denial of the Spot Award on September 11, 2023, falls within that three-month window when pegged to Mrs. Warren's meeting with Ms. Norris on June 15, 2023. Mrs. Warren's allegations also suggest that Spot Awards are likely given at set times of year. Am. Compl. ¶ 36 (noting that various peers

17

received Spot Awards during the same period). This counsels against focusing on the fact that the denial occurred near the outer limit of the three-month window. It is plausible, for example, that Mrs. Warren's supervisors decided shortly after she filed her internal complaint that they would punish her for doing so by denying her a Spot Award when the opportunity arose.

Temporal proximity is also not the only factor that supports an inference of causation in this case. Mrs. Warren alleges that a Spot Award was given to a "GS-14 Black male supervisor named D. Thomas" who had not engaged in EEO Activity. *Id.* ¶ 4. While the allegation regarding D. Thomas may not be sufficient to establish that he was similarly situated to Mrs. Warren for her discrimination claim, it supports causation for her retaliation claim. Specifically, it suggests that Mrs. Warren's denial of a Spot Award was not attributable to a blanket decision by the agency not to give Spot Awards to GS-14 supervisors that year. This makes it at least marginally more likely that her denial was for retaliatory reasons.

<div align="center">*     *     *</div>

For all the above reasons, Mrs. Warren may continue to pursue her retaliation claim based on the denial of her Spot Award. The remainder of her retaliation claims that have been challenged by the Secretary must be dismissed.

### C.     Hostile Work Environment

Finally, the Court turns to Mrs. Warren's hostile work environment claim. To state such a claim, a plaintiff must plausibly allege "that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Strong v. Fort Myer Constr. Corp.*, No. 25-cv-1011, 2025 WL 2643457, at *4 (D.D.C. Sept. 15, 2025) (quoting *Baloch*, 550 F.3d at 1201). "To determine whether a hostile work environment exists, the court looks to

<div align="center">18</div>

the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* (quoting *Baloch*, 550 F.3d at 1201). The Supreme Court has made clear that "conduct must be extreme to amount to a change in the terms and conditions of employment." *George*, 407 F.3d at 416 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). It must create an environment that is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787. By adhering to these standards, a court "ensure[s] that Title VII does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace." *Id.* at 788 (cleaned up).

Here, Mrs. Warren's allegations of discriminatory and retaliatory treatment are not sufficiently severe or pervasive to support her hostile work environment claim. As discussed, Mrs. Warren has not sufficiently alleged facts supporting an inference that any actionable adverse employment action was based on race. And "[c]ourt[s] have 'routinely held that hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class.'" *Jenkins v. District of Columbia*, 281 F. Supp. 3d 77, 88 (D.D.C. 2017) (quoting *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009)). To the extent that Mrs. Warren alleges additional acts of discrimination not advanced as discrete discrimination claims—including her supervisors severely understaffing her unit, setting unreasonable deadlines and excessive work hours, and excluding her from critical meetings, Am. Compl. ¶ 31—those actions are still "typical work-related actions by supervisors" that generally do not "support a hostile work environment claim," *Regis v. Noem*, No. 24-cv-2405, 2025 WL 1580808, at *7 (D.D.C. June 4, 2025) (quotation

19

omitted). The same is true of every potentially retaliatory action alleged by Mrs. Warren, including the denial of her Spot Award and lowered performance review. *See, e.g.*, *Crews v. Carson*, No. 19-cv-3538, 2020 WL 12948520, at *5–7 (D.D.C. Oct. 16, 2020) (low performance reviews, unfair scrutiny, interference with management of subordinates, and a letter of reprimand were insufficient to establish a hostile work environment); *Davila v. Mayorkas*, No. 22-cv-357, 2023 WL 2072455, at *9 (D.D.C. Feb. 17, 2023) (collecting other cases).

At bottom, the conduct alleged by Mrs. Warren is not sufficient to "establish that her workplace was 'permeated with discriminatory intimidation, ridicule and insult' that was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Crews*, 2020 WL 12948520, at *5 (cleaned up) (quoting *Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 64 (D.D.C. 2011)). Her hostile work environment claim—whether based on race discrimination or retaliation—therefore must be dismissed.

## CONCLUSION

For all these reasons, the Court grants in part and denies in part the Defendant's Motion to Dismiss. ECF No. 13. Mrs. Warren's retaliation claims based on the denial of her Spot Award and her inaccurate performance appraisal may proceed. The remainder of her claims are dismissed.

A separate order will issue.

<div style="margin-left:50%">

_____

SPARKLE L. SOOKNANAN
United States District Judge

</div>

Date:   July 9, 2026